Good morning, Your Honors. May it please the Court, I'm Attorney Nora E. Milner, and I'm here to represent today the petitioner in this case, Lourdes Garcia-Peregrina. There are two important issues that we would like to place before the Court for consideration today. They've been briefed, but I would like to review them in our discussion today. The first one is whether the immigration judge committed reversible error by using and relying on the information furnished by the petitioner's abuser in violation of the Illegal Immigration Reform and Immigrant Responsibility Act of 1926. Hereafter, we'll refer to it as IRA-IRA. IRA-IRA Section 384 does not permit the use of this type of a statement in proceedings of this matter. The decision of the immigration – Counsel, was her husband ever adjudicated to be an abuser? No, Your Honor. Okay. Does Section 384 – does it prohibit the use of testimony by somebody who is alleged to be an abuser or testimony of somebody who's been found to be an abuser? Well, Your Honor, Section 384 does not differentiate in that regard. 384 specifically states that it's provided to protect the confidentiality and to protect against witness intimidation, which is exactly what occurred in this case. The use and the – the use of the letter and the admission of the letter into evidence essentially created a predisposition to discredit the petitioner's testimony. Has this been waived by the introduction of the letter by Ms. Garcia's counsel? Well, Your Honor, it was not introduced initially by Ms. Garcia's counsel. The government attorney introduced it. The judge admitted it, and therefore, it became a matter that was introduced – was argued upon later. And yes, it's true that Ms. Garcia's trial counsel did use it. However, it was not introduced by Ms. Garcia's attorney. Didn't the judge – didn't the judge initially, even before testimony, have it marked as an exhibit and indicate that later on he would hear argument as to his disability? Yes, Your Honor, but there's a statement in the transcripts from the 2004 hearing when Ms. Garcia's attorney then elicited testimony on the letter, and that he said that he would move it into evidence, and the judge said, well, it's already been admitted, therefore, we're not going to rule on that issue at this time. But regardless of all that, I mean, the I.J. said explicitly that he didn't rely on it. Your Honor, that's true. However, that isn't really the case. In fact, in the oral decision of the immigration judge, the judge goes so far as to make comments about Ms. Garcia and calling, in fact, into question, he states, quote, her mendacity is malicious, end quote. There was a predisposition on the part of this immigration judge. Well, how does the word mendacity relate to the letter from her husband? It does, Your Honor. In fact, again, the problem with admitting the letter at the very beginning is that it created a predisposition. And to discredit the testimony, Ms. Garcia came to board this Court as a broken woman. There's no question that she was disassociated. She was unstable. There are a number of psychological reports in the record that show that she had been abused. She had advised her medical doctors that she had been physically and mentally abused. She was already a broken woman when she came to this Court. As we'll discuss in the second issue of this case, her treatment that she received before this Court was outrageous, and it went far beyond the bounds of a neutral adjudicator. The issue of the letter being admitted essentially then created a framework by which all of the other testimony was balanced. And it created a higher burden of proof. Basically, yes, Ms. Garcia had the requirement to substantiate her burden of proof, but they set the bar so high, assuming that, in fact, no abuse had been ever perpetrated on Ms. Garcia, that the letter acted to taint the rest of the testimony. In and of itself, did it create the denial of her case? No. But it should not have been admitted for any purpose whatsoever. The second issue in this case really is probably the most troublesome matter in this case before the Court today. Whether the conduct of the immigration judge was so egregious that it violated the due process rights of Ms. Garcia. It wasn't. It was pretty overbearing. I mean, I think anybody would agree with that. But the real question is, what difference did that make? And I don't see in the papers, you know, any challenge on the merits. The problem, Your Honor, and that's correct, we did not challenge the merits of this case because the position is that, based on the conduct of the immigration judge, he prevented the creation of a truly valuable record. He, by his implications, his conduct to Ms. Garcia, calling her a liar, malicious, proposing constant compound questions to the point where she was essentially broken, disassociative, unable to respond, created an atmosphere of hostility and intimidation that intimidatedated her and actually intimidated her two attorneys into complete silence. The immigration judge took over the direct testimony and essentially led this case to the conclusion, thereby preventing the development of an absolutely good record before the Court. This Court has had a remarkable history of dealing with egregious behaviors of immigration judges. In one case, Smolenkaeva v. Gonzalez, which is a 2005 case which was cited in our brief, this Smolenkaeva case was very much on point with the case before the Court today. In that case, the immigration judge accepted at full value the statement or the information from the respondent's abuser husband that the marriage was fraudulent and there had never been any abuse, thereby completely discrediting hers. Other sister circuits have joined this Court in decrying this kind of behavior, and the question really comes down to, when does an immigration judge step out of the role of a neutral adjudicator and then become a prosecutor? So it really is a matter of degrees. We are not arguing that the immigration judge does not have the authority to question, to interrogate, to help develop the record. The question is — And cross-examine. Exactly, and cross-examine. The question is, again, Your Honor, when does it become a matter where the judge essentially becomes the prosecutor, takes over direct testimony, continues the arguments consistently to the point where the case eventually becomes? What would you have shown in your case on the merits if you had not been prevented by the I.J.? Well, Your Honor, as an appellate attorney, I'm obviously restricted by the record that comes before me. Had I been the trial attorney, I have to say before this Court, honestly, I would have handled the case somewhat differently. But what I would say to this Court today is that by preventing the development of an actual record, there is — And we're talking about a case for asylum, right? No, this is for abuse. There is no — the asylum was withdrawn by the trial attorney in this case. This case was presented to the immigration judge as a — Well, I certainly understand from reading the record what her case was. I mean, you know, she didn't try to get in something that was kept out. She certainly got to tell her story. Well, Your Honor, we believe that the most appropriate remedy in this case would be a remand to a different immigration judge. We believe that the actions of this judge in this case were beyond the bounds of a neutral adjudicator, a neutral fact finder, and that upon a remand, Ms. Garcia would be able to fully develop the record. Whether she would sustain her case on the merits, it's true. In order to demonstrate that the trial judge was biased, the agreed party has to indeed show that the judge's conduct reflected a disposition to treat that party unfairly. We believe that the record shows that, that in fact, Ms. Garcia was not treated fairly before this Court. She was a broken woman when she came. Okay. We understand that's your position. You may want to save a little time for rebuttal. I have 50 seconds, Your Honor, and I will say that. Thank you. Thank you. Mr. Ammons. May it please the Court, on behalf of the United States Attorney General, Eric H. Holder, Jr. In this case, there's two issues before the Court. The petitioner challenges the omission of the letter and the immigration judge's bias. Regarding the letter, as the petitioner's counsel noted, in and of itself did not result in any denial of relief. Therefore, that's another way of saying there is no prejudice by the letter being an evidence. As the Court noted as well, the immigration judge explicitly said at the end of his decision did not carry or amend any evidentiary weight to the letter. He stated that because the petitioner's husband was not present for cross-examination or direct testimony, he could not trust the contents of the letter and give it any evidentiary weight. Therefore, there was no prejudice for the omission of the letter. This was a letter filed in 2003 by the petitioner's husband, which he stated there was no abuse when she self-petitioned as a battered spouse. He simply filed the letter, as he stated, to explain why he withdrew the petition. However, the immigration judge did not give it any evidentiary weight. As the Court also noted, the petitioner's counsel sought to rely on it as evidence of vindictiveness at one point. Therefore, she could not later claim that it should not have been properly omitted through evidence. As the Court noted, it may have been waived at that point because they sought to use it as evidence of vindictiveness. And moreover, the immigration judge explicitly noted it could have little or no evidentiary weight. As for the claim of immigration that's biased, it also did not, even if they're assuming there was bias, which the government does not submit or concede, there is no prejudice in this case. There is nothing that affected the outcome proceedings. The petitioner's counsel is pointing to nothing that they could have submitted or on appeals to the Board never pointed to anything that should have been submitted that would otherwise have resulted in anything other than denial of her applications for relief and protection. There's numerous challenges on the Court. Merrick's determination that the— What relief was she seeking? She sought multiple forms of relief. She sought asylum. I understood counsel, opposing counsel, to say that the petition for asylum was withdrawn. I don't remember seeing that in the record myself. It's not reflected in the BIA's decision. Right. And in my reading of the record, the Board denied asylum for untimeliness, and the immigration judge did, and denied holding and cat protection on the merits. I find there's no clear probability of torture or persecution in Mexico because that claim is based on solely threats that she claimed to receive in 2005 that were anonymous. They showed up as caller ID on her phone. She never contacted the phone company. She never contacted the police.  Does she have rights to stay in the United States under anything, under VAWA, for being a battered spouse? Well, at this point— Does that require a separate application? Yeah, there'd be—she'd have to file a motion to reopen at this point and pursue other relief. So she didn't—does the record reflect that she asked for request or requested relief because she was a battered spouse? Yeah, she requested adjustment of status, but there was no visa petition filed on her behalf, and the immigration judge noted that you have no jurisdiction over such a petition as that. So he denied adjustment of status for that reason as well, and that's supported by the record. He also denied cancellation removal of both types, cancellation removal for non-permanent residents and cancellation removal for a battered spouse, on multiple grounds, which are all supported by the record as well, regardless of the letter or regardless of any immigration judge bias. For example, he found that she lacked good moral character because she gave false testimony. He found that she gave false testimony, and this also made up part of his adverse credibility determination, because in her first hearing, she stated multiple times over and admitted that she went to Mexico in 2001 for the Christmas holiday. She also previously conceded that that was alleged in the NTA and that she did indeed go to Mexico in 2001. Later on, the second merits hearing in August 2005, she recanted that testimony, and just kept saying no over and over again, I never went to Mexico in 2001. Furthermore, after that, the INS questionnaires admitted to the record showing that she submitted to the INS through her attorney, another admission that she went to Mexico in 2001. So to the immigration judge, this constituted false testimony when she recanted that, and he denied her applications for cancellation for lack of good moral character. He also denied them for lack of hardship, both exceptional and extremely unusual hardship and extreme hardship, a lower threshold for bad or spouse cancellation removal. And these were both supported by the record as well. She had three United States citizen children, which she based her applications upon. These children were granted in the custody of her husband, her ex-husband at that point. They lived in Calexico, California, right by the border of Mexico, with the husband. She moved to Anaheim, 200 miles away. The immigration judge found that she could not base a hardship claim on these United States citizen children because, one, she did not live with them, and, two, she'd actually be closer to them if she went to Mexico than where she presently lived. And therefore, she could not base a claim saying they would suffer any exceptional, extremely unusual hardship or extreme hardship if she was to move to Mexico. Therefore, those denials of relief are adequately or amply supported by the record, regardless of any claim of immigration judge bias. The same with asylum. She entered the United States, according to testimony, in 1991. And there, she filed for asylum in 2005. It was over a decade untimely at that point, and she never had an adequate explanation for why she filed it over a decade untimely. Or, as previously discussed, there was these anonymous threats in 2005, and those definitely did not rise to the level of a well-founded fear of persecution. Therefore, all her claims for relief or protection were adequately supported by the record, regardless of any claim of immigration judge bias. But regarding her claim of bias, she cites the portions of the transcript from mostly the June 2004 hearing to support her claim that immigration judge had a predisposition to deny her claim. For instance, or for example, she states, at one point the immigration judge said, you are lying, you are a liar. However, this was just one of the instances that supported the adverse credibility termination. In this particular passage, she cites, this is discussing her passport. And on her passport, which was issued by the Mexican authorities in August 2001, she stated she was single. At the time, she was married. And she would, in fact, not seek a divorce until next year in 2002, and the divorce would not be completed until 2004. The immigration judge asked her why, in 2001, she was married and not even sought a divorce yet, why she would list herself as single on the passport. She stated it was something she always did in legal documents. She always listed herself as single. The immigration judge pointed out to her, well, that would be a lie, wouldn't it? If you say you're single when you were married, that's a lie. She had no explanation. She just claimed at one point it was an inadvertence. She mistakenly listed that in her passport. He's not calling her a liar. He's just pointing out the inconsistency. She also said she always used the name Garcia when she signed on as single. But wasn't Garcia her husband's name? I believe so. Her maiden name was Pellegrina? Yeah, Pellegrina, a lower name. I believe so. Well, these are just examples such as this were, well, another example. I believe she states that the immigration judge sought to entrap her in some sort of questioning about the entry date to Mexico in 2001. This is in her first hearing where she freely admitted over and over again that she did, in fact, go to Mexico in 2001. And he didn't seek to entrap her. That passage was laid out in our answering brief. It's a simple question and answer about the when, what, and where, how she went to Mexico in 2001. No evidence of any seeking to entrap her or trick her into giving the answers that she provided. And that just went on to support the adverse credibility termination later on and the lack of good moral character for false testimony later on. I believe she also cites that the immigration judge chastised her at one point. He's asking her why. She's saying, like, it's ridiculous you would stay with someone who's supposed to be abusive when you kept living with your abusive husband after 2002. And he's not chastising her. He's just asking her why would someone who sought a divorce in 2002 from their husband continue to live with their husband after filing for divorce? Not an unreasonable question to ask when most couples or it's reasonably accepted that most couples separate after they file for divorce. That's all he was asking. He's not chastising her, yelling at her, or accusing her of anything. He's just simply trying to ask her and elicit the details of her claim, which he has statutory authority to do, as Fishner's counsel conceded under 8 U.S.C. 1229a.b.1. He can interrogate witnesses. He can cross-examine witnesses and develop the record. For any claims, he also found there was no battery in this case because of the adverse credibility termination, but also because there's just nothing in the record beyond her mere accusation of battery in her last merits hearing. There's nothing else in the record supporting that claim. And Jim Gresham is very sensitive, and this is important to note that he's very sensitive to the fact that it is hard for a victim of battery or abuse to come forward with their claims, usually. He notes that in his decision. But he also notes that she'd inconsistently testified about various other points in her testimony. And before 2005, she'd stated there was no physical abuse. She never stated that to the family court, in which there was a custody determination for her children. There was a psychological evaluation in 2003 leading up to those divorce proceedings, or as part of those divorce proceedings. She never told the psychologist or psychiatrist anything about abuse, just simply stated that she believed her husband was unfaithful, and he psychologically controlled her. And in fact, that same report has her three children also providing their accounts of the marriage. And her children do not report any physical abuse. And in fact, the oldest child, Jacinto Jr., who was 11 years old at the time, stated that he believed his mother to be a liar. And he states in his own psychological evaluation that his mother lies about things. All this was before the immigration judge, until her claim all of a sudden evolved from the point of stating that she had no physical abuse, where she changed that testimony and came back a year later, after the immigration judge pointed out to her that what she had previously testified to, which was simply a controlling husband, did not meet the level of extreme battery. A year later, she comes back and states, well, there was physical abuse. In the immigration judge's eyes, he reasonably determined, because there's no medical records, and actually the medical records show that she never had any kind of venereal diseases. She claimed at one point her husband infected her with venereal diseases. There was none of that in the record. There was nothing corroborating her claims. The immigration judge reasonably denied all these claims. And therefore, there's no prejudice regardless of any bias, and there is no bias in the proceedings. All right. Thank you, Mr. Remnitz. Ms. Miller. Thank you, Your Honor. I'd just like to respond to one point made by counsel, that there were no documents in the record regarding any abuse. In fact, in the excerpts of the record at page 33 for the Court to review, in a report given in April 2005 to the South Coast Medical Associates, Petitioner freely reported the mental and physical abuse that her husband had perpetrated on her. And there were some other statements in the record throughout the transcripts, including several made by the government attorney that related to the fact that Mrs. Garcia had testified that her husband had raped her, was physically assaulted to her, and that the sexual encounters were enough to cause vaginal bleeding. Therefore, there is documentation in the records. With that, we would close. Thank you, Your Honor. Okay. Thank you, counsel. The matter just argued will be submitted in the next-year argument in Grue, Toronto.
judges: Alarcon, Rymer, Bybee